And we'll turn to U.S. Securities and Exchange Commission v. Peyton et al. Mr. Morvillo? Good afternoon, Your Honor. May it please the Court? Go ahead. My name is Gregory Morvillo. I represent Benjamin Durant in this case. We filed on several grounds. Myself and Mr. Fishbein, who represents Mr. Peyton, are going to split the argument. I have five minutes, he has six, and then we'll take one for rebuttal. I'm going to limit my comments and my argument to the issue of duty, i.e., who is the tipper in this case. And I'll get to that in a minute. Mr. Fishbein is going to address the knowledge of the breach. And the middle argument is a personal benefit argument. And we have read Martoma. We stand by our brief. But if Martoma stands, and we understand it's under en banc consideration at this point, if Martoma stands, we think that personal benefit is satisfied in this case. And so, I don't want to keep the panel in suspense any more than I have to. We believe that Michael Dallas is the tipper in this case. And while this is not a great revelation, because we did say that in our briefs,  Michael Dallas worked for Cravath. Michael Dallas knew he had an obligation of confidentiality to his law firm. Michael Dallas had material, non-public information about an acquisition that he was working on. And Michael Dallas took that information and had brunch with a friend and gave it to him. And he gave him that information because he says he was so stressed out, his life was so hard because he was working for a mean partner, that he had to tell his friend the acquiring company, the name of the target, the timing of the deal, the approximate price, and that it was an all-cash deal. And his friend understood. His friend understood as he was hearing this information, I think Michael Dallas wants me to trade on this information. That's what I'm receiving from this. There's certainly evidence to that effect, but there's also evidence to the contrary, isn't there? And if there is evidence to the contrary and evidence to that effect, isn't that a jury question? I don't think so in this case, Your Honor, because under 10b-5-2, the law requires this to be viewed from the recipient's perspective. 10b-5-2 says there has to be a history of confidence such that the recipient of the information, in this case Trent Martin, understood that the information was supposed to be kept confidential. So while Michael Dallas testified that it was his intent for Mr. Martin to keep the information confidential, it's really not relevant because it's what Martin understood. And Martin understood initially, during that conversation, he wants me to trade. He then went home and thought about it. He wants me to trade is different from wants me to pass it on. Understood. And it seems to me almost inconceivable that a tipper in the position of Dallas who passes it on to his friend with the intention that the friend trade also wanted him to blurt it out to lots of other people, making it all the more likely that Dallas would be discovered in his indiscretion. That's certainly true, but there is no specific duty. There's no legally cognizable duty that allows Michael Dallas to say to Trent Martin, look, I'm going to allow you to trade on this information that doesn't belong to me, but I'm going to impose some fictitious duty that you can't tell other people. Once Michael Dallas breaches his duty to Cravath, the duty is breached, and he doesn't have a legal basis to go to Mr. Martin and say you're not allowed to talk. And indeed, if he really didn't want him to trade and if he cared about this at all, he never would have gone back to him a second time and given him more information. He went back a second time two weeks later and said, oh, by the way, I'm confirming for you that it's $50 a share. It's just that if the Dallas in the piece, if the Dallas in the hypothetical says to his friend, I'm giving you this information, it's confidential information. I'm breaking the law in doing it. I'm doing it as a favor to you so that you can make some money because I know you need to make a payment on your mortgage. I'm doing it as a favor for you, but don't pass it on to anybody else. This is just between you and me. You're supposed to buy yourself 1,000 shares, but don't pass it on to anybody else. You're saying that that person can then pass it on to other people and there's no liability on their part for trading, that they are free to trade on the persons who got it from Dallas's tippy are free to trade without liability? Well, no, we're certainly not suggesting that there's no liability down the chain. In this case, Mr. Dallas is the tipper. Mr. Martin breached and he... I don't understand why that helps your case. Because the law requires that a breach and duty need to be established. And the SEC established duty, but they never established breach because they created a fictitious breach between Mr. Martin and Mr. Dallas. The breach happened at the law firm level. Mr. Dallas owed the duty to the law firm. That's where the breach was. They're not allowed to, and perhaps, to your hypothetical judge, they could have said, or Mr. Dallas could have said to Mr. Martin, don't tell anybody else this. And if Mr. Martin said, I swear I will never reveal this to another soul, then maybe somebody under some law could say that's a legally cognizable duty. But that's not what happened. He simply said, I'm really stressed out, and here's my information, and then later was upset that the information got passed on. That's not the same thing as acquiring a promise. Why can't the fact finder draw the inference that Martin was breaching a duty in passing it on to other people? Because there was no evidence that suggested that Martin understood that he was supposed to keep this to himself. No evidence was suggested. I'm sorry? We're supposed to draw the inference that he's a dunce? No. He understood that he had this information. He understood that his friend was giving him confidential information. He also understood that it was wrong. Why wouldn't you think if somebody gave me confidential information which was wrong because he was my friend that I wasn't supposed to put it on? Why isn't that in itself evidence that a person might have thought, yeah, thanks, but I shouldn't pass it on? Because Michael Dallas doesn't have the ability to create a duty that doesn't exist in law. The duty is not to trade and to tip. But once that duty is violated, the duty is violated. You can't say that it's a bifurcated duty because there's no law to suggest it's a bifurcated duty. It's a duty not to trade and not to tip. Once you have traded, the duty is already gone. The duty has already been violated. Part of the duty has been violated, but not the part that forbids sending information on and increasing the amount of violation. And we're not suggesting that Mr. As I understand your argument, it just means that persons down the line are absolutely free to trade on improper tippy information. That is not at all our position. We are not suggesting that Mr. Martin or Mr. Conrad were free to trade at all. We understand that there has been a violation of the insider trading laws here. We understand that Mr. Martin and he understood that he had violated. The question is whether it's been a violation of the insider trading laws by your clients. Correct. And Mr. Fishbein is going to talk about the knowledge of the breach in this situation. If they knew the breach, if they knew there was a breach between Dallas and the law firm, perhaps there is liability here. But they didn't know that. And he will address that. But that's where we get to. There is no, they've never even established the actual breach. They established a fictitious breach because breach is breach. You can't have a partial breach of the law. Either he had a duty and he violated or he didn't. Breach by trading? It was breach by trading and then. Would one breach by trading? Yes. And would one breach by passing the information on? Yes. Correct. So you have a breach by trading and a further breach by passing the information on. Yes, but it's a further breach. It's not a separate breach. It's the same breach. In other words, Mr. Dallas gives the information away that he's not supposed to give. And that's the breach. It isn't the breach that Mr. Martin did. It's the breach that Mr. Dallas did. He was not entitled to take that information and do with it what he pleased. It didn't belong to him. It belonged to Cravath and it belonged to IBM. And when he gave it away twice, not just once, but twice, he violated that duty. That's the duty that was violated. The SEC has created this duty between Martin and Dallas based on 10b-5-2. But that information is, that violation has to be looked at from Mr. Martin's perspective. And I see that I'm well over my time. If there are no further questions, I will sit down. Thank you, judges. Good afternoon. Matthew Fishbon. I represented Mr. Payton at trial. I'm going to get to knowledge, but I want to start by addressing Judge LaValle's question, which was, if there was no breach by Mr. Payton, would anyone down the chain be free to trade? And the answer to that is no. Because what this case ultimately comes down to, and it's what makes these remote tippy cases problematic, is that there needs to be not simply a breach, but there needs to be knowledge on the part of the people at the end of the chain. The reason it makes a difference here. Knowledge of? Knowledge that the information has been obtained in violation of a breach of duty in exchange for a personal benefit. And the reason it makes a difference that the SEC charged this case incorrectly here is because charging Martin as the tipper, as opposed to one step back in the chain, Dallas being the tipper, made the tipping chain one step closer to Mr. Payton and Mr. Durant. It made their proof of knowledge that much easier because of the way they charged it. Now, we would argue that it was insufficient evidence of knowledge, whoever the tipper is here. But the reason it makes a difference that the SEC came up with this fiction that, gee, you know, Mr. Dallas gave us information because he was stressed and not because the breach started with him is because it made it closer to Mr. Durant and Mr. Payton. That's fine. But the question remains, was there a breach of a part of Martin? And that depends on whether he understood that he should not have done what he did. And despite your co-counsel, I think there is evidence that he did understand there are things that were said. So then we've got to come to what you're going to tell us that your clients didn't know of that. Just before I get to knowledge, just briefly, I guess the answer to that is there's no honor among thieves. You can't disclose the information for one purpose but not for another. Why not? Because if you have breached your duty, Dallas has breached his duty by imparting the information, the confidentially obtained information for which he got only because he was a lawyer for this client. By giving the information to Martin to trade, he can't say I'm going to allow you to trade it but I'm imposing a duty on you not to do anything else with it. He can't selectively disclose it. It seems to me that that's the normal situation. If I am corrupt in this respect and I have confidential information from my employer Cravath or IBM of undisclosed market information of value and I've got a dear friend who I want to benefit, I say I'm going to give you some hot confidential information. The normal expectation would be in that circumstance that the person who's giving the information wants to allow the person he gives it to to trade because he wants to benefit him but he doesn't want him to go blabbing all over the street and telling all of his friends. That's the normal situation. You wouldn't want it because the more the person you gave it to blabs, the more likely it is you're going to get caught. Of course, Your Honor. The point is that we're trying to make here is that the breach of the case is one step earlier in the chain. Let me get to knowledge because at the end of the day, that's what really matters in this case, that the evidence here was insufficient to prove that the defendants knew or had reason to know or consciously avoided that the information, not that the information was material non-public information, but that the information in fact was disclosed in violation of a breach of the case. I think the place where this court, the panel should start is with this court's decision in Newman because obviously there's been a lot of discussion about Newman and personal benefit. But as the Supreme Court made clear in Salmon, the core holding of Newman, which was that there was not sufficient evidence in that case to establish knowledge or even conscious avoidance, that holding stands. Of all the cases that this court has addressed conscious avoidance, Newman is the closest in the facts to this case. It involved remote . . . Isn't that because in Newman the information was of a sort that might have just been rumor, that might have just been speculation rather than information? There were a number of arguments that the government made to try to establish conscious avoidance in Newman. And many of those arguments are similar to the ones that were made here. One of the bases for the court's decision was it said, look, you may have shown government by the facts that you're arguing here that the defendants knew it was material non-public information. But there's no evidence establishing that they were put on notice that it was obtained improperly. One of the reasons being is that information about earnings, information about potential buyouts, information that's material and maybe non-public about companies can be disclosed in ways that don't breach duties. It can be disclosed inadvertently. Wasn't there evidence that your clients knew that they were engaging in wrongdoing in terms of the names they used, in terms of tax things? Isn't that evidence because they had this evidence of wrongdoing that they knew that somewhere along the line there was this breach? And as far as they're concerned, where the breach must have been was where your co-client says it couldn't have been. But if it was, that's just where they had to know. A couple of responses to that, Judge Calabresi. First of all, all of those actions took place after the public announcement of the deal. And there's no question that at that point the defendants, along with the others, panicked. They understood that because of the size of the trades there was bound to be scrutiny. And Mr. Payton opened up a new account to try to move the money so it wouldn't be as easily disclosed. But I think I would submit to you that that's of very little relevance because it all took place after the public announcement. And, in fact, one of the interesting contrasts is — I'm missing something. For what? Well, here's what — Trying to cover up your tracks indicates awareness of the illegality of your conduct. Well, not necessarily. No, not necessarily, but it's a reasonable inference to interpret it that way. You've done nothing wrong. When you contrast that with the actions that they took before the public announcement, and one of them is you mentioned trading in a — establishing this new account and lying about it. I mean, interestingly, Mr. Payton traded in his own account, in his own name, at an account that was open to view by anyone at his firm, Aeropacific. I don't for a moment deny that there is evidence on which the jury could have found no knowledge. My question is, is there enough evidence? However, I might have decided on the basis of which the jury could have said, gee, what they did afterwards smelled bad enough in terms of before, but I think they really knew. Now, that's the only question which we as appellate judges have before us. Well, I think that's why it's very instructive to compare the facts here to Newman, because many of the same arguments that the SEC makes here or that Judge Rakoff relied on were ones that were made in Newman, that the information was specific, that it was given just before the public announcement, that it was given frequently. All of those are — that the defendants were sophisticated, that they understood the insider trading laws. All of — Was there in Newman this exposed behavior? Not that I'm aware of, Your Honor. And that does — obviously, we're not arguing that that's irrelevant. But I would say to you that the relevance of that information goes more to the defendants' understanding that they had material nonpublic information, which by itself violated their firm's policy, because their firm's policy was actually stricter than the law. Their firm's policy said if you have material nonpublic information, regardless of how you got it, you can't trade it. So they were very much aware that given the nature of their profits, that they were going to get in trouble with their firm. And they took a number of steps to — There's no doubt that there are explanations. My question remains, could a jury have put that together with the things that Newman didn't say — said were not sufficient to come up with something that was sufficient? Well, I — But I don't know. I think — I would say to you that the evidence still remains insufficient to establish knowledge or conscious avoidance of the manner in which the information was obtained. I would just — I see I'm over time. If I could just make one final observation, and that is look not just at Newman, but look at the other cases that this Court has addressed the issue of conscious avoidance in the insider trading context. Svoboda, Gopher, Whitman are the three leading cases. I don't have time to go through the comparison here, but if you look at those cases, in each of those three cases, the Court found there was a sufficient basis for finding conscious avoidance because the facts went beyond simply knowledge of — that the information was material and nonpublic. There was knowledge or there was information that alerted the defendants to the source of the information and that the manner in which it had been disclosed was improper. And so in this case, affirming this judgment here would extend insider trading to remote tippies in a way that this Court has never done before. And particularly when you factor in that brokers this far removed from the case, their job is — they are constantly getting rumors, information about stocks. Their job is to get that information. Their job is to trade on it for their clients, trade on it for themselves. So this Court has made clear in the past that in that context where you have remote tippies, the only way that they should be held liable is if there is sufficient evidence to show that they were put on notice, not just that the obtained in breach of a duty. Thank you. JUSTICE SCALIA. Thank you. Counsel for the SEC. DAVID LAZIZA. May it please the Court, David Laziza for the Securities and Exchange Commission. Now, there were competing narratives in this case and a jury resolved them and found the defendants civilly liable as tippies. I believe that they're correct. Conscious avoidance is the major issue. We've never quite understood the defense based on the duty here. There is a breach for personal benefit. Even in their most extreme view of the case, you still have the defendants consciously avoiding that someone or a person breached for personal benefit. That's the instruction that they were given with regard to conscious avoidance. And you have very good evidence, the Court pointed out, that Martin himself, the recipient of the information, understood that he had a duty not to tell other people. That's at A2830 to 31. In their reply, they say, oh, well, we have had objections to the admitting that testimony, but it was not in their opening brief, and they just can't bring it up. And also with regard to the testimony from Dallas, the Court, as part of the analysis of the rule, you can look to the reasonableness of the duty that Martin, the recipient, felt based also on the testimony of Dallas. So that also is evidence that can go to the reasonableness of the duty. But we don't really understand why that helps their case, and I think it might help to just move to conscious avoidance unless the Court has more questions about it. I have a preliminary question which maybe one can't answer directly, and that is why did you proceed on the theory that Martin was the tipper, and why not argue that Dallas was the tipper? Is there a theory here? Yes. I mean, the Commission had to look at the evidence and assess who was culpable. And we have this Court's guidance in Gansman, which suggests that an attorney— What case? Gansman. Yeah. And which suggests very strongly that an attorney, in that case, an attorney gave information about acquisitions to his mistress, and he wanted to bring a defense. And his defense was, well, my mistress and I have a confidential relationship, obviously, and I didn't want her to trade. And this Court said, well, that's a perfectly appropriate theory. The jury there did not happen to believe that theory. So in every tipping case, we have to answer this question, even in the context of an attorney, Gansman says. Which is, did the tipper give the information in confidence? So they're not really a tipper at all. They're not culpable. I understand why you could do it, but Judge Cabranes's question doesn't stand. Right. Was there something about knowledge or about something? Because as I heard it, the evidence about knowledge would be about as good with respect to Davis or conscious avoidance as it would have been with respect to—I mean, Dallas is with respect to Martin. Absolutely, Your Honor. The Commission took the harder path, and the reason was because that's where the evidence showed them. An investigation showed that Dallas did give this information over in confidence. And had we charged instead Dallas, he would have been able to mount the defense that Gansman had. So we had to make an assessment about the evidence as a matter of investigation. How could he do that? How could he do— Mount that defense? Well, I think that if you would try to—all the evidence in this case shows that he would be successful in mounting that defense because the jury would agree with that version of the facts, that he provided this—his defense would be, I provided this information to Martin in confidence. Look, Martin understood that, and I understood that, and you have this rule. Confidence meaning intending that he not trade and that he not pass it on, that it's just I'm telling you because you're my friend. I've got this big problem. I'm worried about my work. I'm telling you all about it. I don't want you to trade. You're supposed to understand that it would be highly illegal for you to trade or pass it on. It's like, for example, if he went into the confession booth and to his priest he said, I'm confessing that I have sinned in my mind because I have contemplated trading on this inside information. I hear that IBM is going to buy SBSS, that that would not be an illegal tip because it was done under circumstances where there was no intent that it go into any illegal—is that the theory of the case that you cited? Yes, essentially. Okay. The court says as far as the insider trading rules, that's perfectly appropriate. As far as the ethical rules, that may not be ethical. That could be— What is appropriate? This court said that that would be a perfectly appropriate theory, a defense. A defense. An appropriate defense. I gave it to my priest as a confession of my bad thoughts, but there was no intention that the priest trade on it or pass it on. Certainly the priest case is an easier case. But it's an extension of that. Same theory. Yes. Okay. But now, so let me ask you this. Supposing that I receive, that when I go out to dinner tonight, somebody says to me, I got a great tip. IBM is about to make a cash offer of $60 a share for SBSS. This is very confidential inside information. Am I free to go and trade on that because I'm in ignorance? I mean, under circumstances where wouldn't this evidence, this is the totality of the evidence, doesn't that evidence support the inference that I knew or suspected knew that there was a high probability that this evidence came from insider sources? Particularly if I received the information from somebody who's connected with people who work at big law firms that represent companies like IBM or major securities houses. That evidence, it seems to me, would support the inference that I at least suspected that this information came as a result of somebody's indiscretion, an intentional tip, as opposed to some completely hazardous thing like somebody overhearing through a duct in the air conditioning confidential conversations. Isn't that enough? Is that not enough to establish liability of a person who receives that information and trades on it? I think that the question of can a person trade on it involves looking at a lot more of the circumstances of the tip. Now, you started to talk about some of them, and I think it has to be the information, not just going to materiality. I told you the nature of the information. IBM is about to offer $60 a share for this stock that trades at $26. I think absolutely a buyout is a different kind of information. Courts have drawn that distinction, and you have that evidence here. Also, you have specific testimony by the defendants that we understood that's the kind of information, kept tightly under wraps. I think you have to look at the sophistication. They're registered brokers. They understand exactly what this means. They're certainly at least reckless. If the circumstances are such that one can draw the inference that the tippee had good reason to believe that this evidence very likely came, not necessarily, but very likely came from an illegal tip, an illegal disclosure of confidential information. Yes, but I mean we have an abundance of such evidence here. You have to have in that situation some evidence to the contrary. The tipper saying that I have that says I was sitting behind two law partners in an airplane, and they were talking, and they got talking about this, and I heard them. They didn't know I was there. I just heard them talking about their business, and I think that's that. Now, would that be enough to say that's okay? I mean, what is it that lets the person then be able to trade? Well, I think that there is . . . so there's two possible or maybe an enormous number of defenses available to a defendant in this situation. They would have to have . . . the Newman defendants are awash in this kind of information. They are portfolio managers. They get it from analysts. They have this information all this time. Defendants, and it was earnings information, not about defendants, are working at a brokerage that pitches its customers to buy gold, to get out of U.S. stocks. They don't get the information from an analyst. They're not aware . . . not that an analyst would immunize necessarily the trading, but they're not aware of any kind of analyst in the chain. They actually know that they get it from someone who they distrust, who they find to be green. They also could find, as in Newman, that this was the kind of information that had been disclosed before. The Newman defendants had this information also from modeling. You don't have that kind of evidence here. They're not getting this sort of information as part of their routine job. They go back for updates, which is another crucial piece of evidence. They go back and they say, hey, ask your friend and roommate. Get us more so it's not overheard on a train. But, of course, that would be another situation there's no life. I understand why you presented the case on an alternate theory from Dallas being the tipper, because you were worried about a defense that could be raised on that basis. But even if Dallas was the tipper, if as the information was presented to these defendants, the ones who traded, there was plenty of evidence from which the fact finder could find that they either knew or very likely suspected and preferred not to inquire into the probability, the high probability that this was an improper disclosure of inside information. Why isn't that a sufficient basis? I think that's exactly right. I would also like to point out that there's this sort of accusation that we're shortening the tipping chain. But if you accept the proposition in Newman in footnote 3 that you don't need exact information of the identity of the tipper or the identity of the personal benefit, our evidence as to their conscious avoidance is the same because their knowledge does not reach back to either Martin or Dallas. This idea that we were shortening the tipping chain doesn't matter. Their defendant is a lot like . . . Why did you go to this rigamarole rather than just say Dallas? The evidence showed as an investigation suggested that Dallas was not culpable. He was not a tipper. He gave this over in confidence. The defense is available in this circuit under Gansman. And so we're not about to charge, even if it would be easier to show the duty and the same level of conscious avoidance. In confidence, what you mean by that is gave it with the expectation that there would be no trading and no passing on. Yes. That's right. All right. Thank you. Mr. Morvillo has reserved one minute. You're going to take it from him. I really want to make two points. Judge LaValle, when you asked if someone receives specific information about a proposed deal, the amount of the shares and whatever, and you said, wouldn't you suspect that that was obtained improperly? And you said particularly if you got the information from someone at a big law firm. The reason that this case is different is because that's not where our clients got the information. They were four levels removed from the person at the law firm. And so they got it from a green broker who did not give them those sorts of specifics. A broker who they did not think was inexperienced. They did not think very highly of. And they treated this as a rumor. And, in fact, they didn't get that sort of specifics that the SEC has alluded to. They were told that it was ripe for a buyout. They were told that IBM was the possible acquirer. But they did not get the specific information about the date and the amount until one day before the public announcement, which was, in fact, after they had traded. What I think might help to illustrate my point, and this will be my final point, is to look at the following hypothetical and why, ultimately, this is unfair and arbitrary to hold our clients accountable here. Suppose you had the exact same facts as you do in this case, but with one difference. Instead of Mr. Dallas giving the information to Martin for whatever reason, either because he wanted him to trade or because he was hoping he was going to keep this deep, dark secret. But let's say they didn't know each other. And it's the situation that you posited. Mr. Martin overhears Mr. Dallas speaking on his cell phone to someone back at Cravath, and he's talking about all of the same details that were imparted here. The rest of the case is the same. Martin tells Conrad. Conrad tells some of his friends at the brokerage firm. And eventually, that information gets to our clients. It's the exact same situation. Our clients have the same information. They have the same details about the information. They have the same knowledge and lack of knowledge that they have in this case. What conclusion do you draw? Well, what I draw from that is that in order for them to be held accountable, they have to know more than the fact that this is material, non-public information. Sloboda is a great case to look at. I think, Judge LaValle, you were on the panel in that case. That's a case where the TIPI claimed that lack of knowledge. The court found there was a basis for conscious avoidance because he got the information directly from the credit officer at the bank who he knew was privy to confidential information. There was a three-year pattern of giving information. And every time the information was given, it was miraculously followed, right, by the fact that there was a material event. And to top that all off, the TIPI himself testified at trial that, in fact, he had shared the source of the information. Whitman and Gopher are similar. The court has hesitated to extend liability to remote TIPIs like our clients and refused to do so in Newman for that reason, where there isn't that type of information, the Sloboda type of information, which alerts them not just that it's material, non-public information, but that it was obtained in breach of a Thanks, Mr. Fishman. Thank you, Your Honor. We reserve the decision, and we are adjourned. Court is adjourned.